UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
CHARLES V. RYAN IV, on behalf of himself )
and on behalf of others similarly situated,   )
            Plaintiffs                   )
                                        )          Civil Action No. 05-30017-MAP
            v.                           )
                                        )
ROBERT J. GARVEY, and PATRICK J.        )
CAHILLANE in their individual capacities,    )
            Defendants                   )
_____)

## MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION

Plaintiff Charles Ryan seeks to represent a class of more than one hundred people

who were illegally strip searched at the Hampshire Jail and House of Correction ("Jail")

from January 18, 2002 to November 7, 2002, under a policy of conducting strip searches

without evaluating for individualized reasonable suspicion:

(1)    while waiting for bail to be set or for a first court appearance after being
       arrested on charges that did not involve a weapon or drugs or contraband
       or a violent felony; or

(2)    while waiting for a first court appearance after being arrested on a default
       or other warrant (for example, those issued by the State Parole Board) on
       charges that did not involve a weapon or drugs or contraband or a violent
       felony; or

(3)    while held as a witness; or

(4)    while held after a finding of civil contempt of court for failure to pay child
       or spousal support, a judgment, or a fine.

Plaintiff moves the Court to certify this case as a class action under Fed. R. Civ.

P. 23(b)(3).

I.    **INTRODUCTION**

Plaintiff Charles Ryan seeks to represent a class of approximately 124 class members who were injured by the unconstitutional strip searches at the Jail pursuant to a formal written policy established by Hampshire Sheriff Robert J. Garvey and implemented by Deputy Superintendent Patrick J. Cahillane. On November 8, 2002, the defendants changed the policy to conform to the Constitution.

In at least fourteen states, including Massachusetts, courts have certified similar class actions because they serve the interests of justice.  In this district, two very similar class actions have been certified for pre-arraignment detainees who were strip searched at a jail based on a similar blanket strip search policy: Mack v. Suffolk County, 191 F.R.D. 16 (D.Mass. 2000) and Connor v. Plymouth County, Civil Action No. 00-10835-RBC. The First Circuit approved class certification in two similar cases. Tardiff v. Knox County, 365 F.3d 1 (1st Cir. 2004). If this Court certifies this action, it will preside over a manageable case that will provide a uniform and efficient resolution of the defendants' strip search practices.

II.    **FACTS**[1]

A.    **The Named Plaintiff Was Strip Searched Pursuant to the Jail's Policy**

Plaintiff Charles Ryan was arrested at 4:45 p.m. on Friday,  January 18, 2002 in Worthington, Massachusetts for allegedly violating a protective order two days earlier.

---

[1] In considering a motion for class certification, the allegations in the complaint must be taken as true. Maneely v. City of Newburgh, 208 F.R.D. 69, 72 (S.D. N.Y. 2002).

There was no allegation that the violation of the protective order involved violence or a threat of violence; the alleged violation consisted of driving by his ex-wife's home. Mr. Ryan was taken by state police officers to the Russell State Police Barracks for booking. State police officers then took Mr. Ryan to the Hampshire Jail to be held for his first court appearance on the following Tuesday morning, since Monday was a holiday.

On admission to the Jail, a correctional officer ordered Mr. Ryan to remove all of his clothing and submit to a strip search. Mr. Ryan removed his clothing and followed the orders of the correctional officer to bend over. The correctional officer visually inspected the plaintiff's nude body including his genitals. The officer had no reason to suspect that Mr. Ryan had any weapons or contraband hidden on his person. After the strip search, the officer told Mr. Ryan to change into a jail uniform.

On January 22, 2002, Sheriff's officers took Mr. Ryan to court. He was arraigned by the judge and released from custody. The criminal charge against Mr. Ryan was dismissed a few months later in May 2002 when the Commonwealth filed a *nolle prosequi*. Mr. Ryan suffered emotional distress as a result of the strip search.

**B.** **Defendants Had a Policy of Strip Searching Arrestees without Individualized Reasonable Suspicion**

The strip search of Mr. Ryan conformed to the policy which was established and implemented by the defendants to conduct a strip and visual body cavity search of every person who was to be admitted to the Jail.

The policy provided in relevant part:

b.    In conducting a strip search, the following procedures should be followed: the inmate should remove his/her clothing, place each article on one location and then move at least five feet from that location.

c.    Subsequently, a Correctional Officer will conduct visual examination of nude inmate, including hair, ears, nose, under the tongue, armpits, pubic region, rectum, vagina area, inner portions of legs, between toes, soles of feet, any casts or bandages, false teeth or artificial limbs. The inmate should be given verbal instruction so as to ease and expedite the situation.[2]

The policy applied regardless of the person's charges or anticipated duration of detention. These searches took place without individualized reasonable suspicion of contraband. The policy directed employees of the Sheriff's Department to conduct illegal strip searches of the plaintiff and members of the plaintiff class.

The Sheriff's formal written policies for the Jail did not make any distinction in the level of cause needed to conduct a strip search of pre-arraignment detainees from the cause needed to strip search pre-trial detainees or convicted prisoners. Garvey and Cahillane knew, or should have known, that the policy or practice of conducting strip searches, without individualized reasonable suspicion, at intake of pre-arraignment prisoners was in violation of the United States Constitution. They had an obligation to correct this practice so that it would conform to the Constitution but instead they allowed it to continue until November 8, 2002. Holding the law was clearly established in 1997

---

[2] Hampshire Sheriff's Office Jail and House of Correction Policies and Procedures Number 3.1.17, <u>Searches</u>, Section C (2)(b)-(c), attached as Exhibit A.

that routine intake strip searches of pre-arraignment detainees like the plaintiff and members of the plaintiff class without evaluating for cause were unconstitutional, on July 31, 2001, a Massachusetts district court issued a decision granting summary judgment to plaintiffs for a similar policy implemented by the Sheriff of Suffolk County.[3]

## III.    ARGUMENT

### A.    STANDARD OF REVIEW

The named plaintiff moves this Court to certify this action as a class action pursuant to Federal Rules of Civil Procedure 23 (a) and (b)(3). Rule 23 provides that any action may be maintained as a class action when it meets the four prerequisite of subsection (a) and fits within any of the classifications set out in subsection (b).  The requirements of Rule 23 are to be liberally construed, as the policy underlying the Rule favors the maintenance of class actions.[4]

Class certification, like most issues arising under Rule 23, is committed in the first instance to the discretion of the district court.[5]  In close cases, courts should err in favor of certification.[6]  While a court may probe behind the pleadings in reviewing a motion for class certification, it is not required since "[s]ometimes the issues are plain enough

---

[3] Ford v. City of Boston, 154 F.Supp.2d 131 (D.Mass. 2001).

[4] King v. Kansas City Southern Industries, Inc., 519 F.2d 20, 25-26 (7th Cir. 1975).

[5] Califano v. Yamasaki, 442 U.S. 682, 703 (1979). *See also,* Lamphere v. Brown University, 553 F.2d 714, 719 (1st Cir. 1977).

[6] Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir.), *cert. denied*, 474 U.S. 946 (1985).

from pleadings. . . ."[7]  Rule 23 does not confer authority "to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."[8]

**B.    THE PREREQUISITE OF RULE 23(a) OF THE FEDERAL RULES OF CIVIL PROCEDURE ARE SATISFIED IN THIS CASE**

The named plaintiff here may sue on behalf of the proposed class because:

(1)    the class must be so numerous that joinder of all members is impracticable;

(2)    there must be questions of law or fact common to the class;

(3)    the claims or defenses of the representative parties must be typical of the claims or defenses of the class; and

(4)    the representative parties will fairly and adequately protect the interest of the class.[9]

The proposed class meets all four requirements.

**1.    The Class Is So Numerous That Joinder of All Members Is Impracticable**

The proposed class includes approximately 124 class members who have been affected by the Sheriff's strip search policy and who have had their rights violated by this policy.[10] Thus, joinder of all these people as individual plaintiffs would be impractical.

---

[7] General Telephone Company v. Falcon, 457 U.S. 147, 160 (1982).

[8] Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974).

[9] Fed.R.Civ.P. 23(a); Mack v. Suffolk County, 191 F.R.D. 16, 22 (D.Mass. 2000); Fraser v. Major League Soccer, L.L.C., 180 F.R.D. 178, 180 (D.Mass. 1998).

[10] Ex. B. at ¶9 (Affidavit of Myong J. Joun).

*Newberg* notes that "the difficulty inherent in joining as few as 40 class members should raise a presumption that joinder is impracticable. . . ."[11]  This is especially true in this case which alleges a violation of privacy since many class members may have had their constitutional rights violated but would be reluctant to be publically identified as a plaintiff.  This Court should find that the "impracticability of joinder" prerequisite has been satisfied.[12]

## 2.    There Are Questions of Law or Fact Common to the Class

Courts often look for "an essential common link among class members" that can be remedied through litigation.[13]  The common question of law in this case is whether it was legal for the defendants to establish and implement a policy of conducting blanket strip searches and visual body cavity searches of the class members before admitting them to the Jail. Each class member's claim hinges on this issue. Rule 23(a) requires that plaintiffs' claims be common, not necessarily identical.[14] The Court of Appeals for the First Circuit has ruled that class certification is inappropriate only if there are *no* questions of law *and no* questions of fact common to the class.[15]

---

[11] 1 Herbert Newberg & Alba Conte, <u>Newberg on Class Actions</u>, §3.05 at 3-25 (3d. ed. 1992).

[12] *See* <u>Fraser</u>, 180 F.R.D. at 180 (granting class certification and finding that approximately 200 Major League Soccer players were too numerous and joinder impracticable); <u>Carrier v. JPB Enterprises, Inc.</u>, 206 F.R.D. 332, 334 (D.Me. 2002) (where a proposed class of 123 employees met the numerosity requirement).

[13] <u>Newberg on Class Actions</u>, § 4.25 at 4-86.

[14] <u>Gluckenberger v. Boston University</u>, 957 F.Supp. 306, 325 (D.Mass. 1997); <u>Hassine v. Jeffes</u>, 846 F.2d 169, 176-77 (3rd Cir. 1988); <u>Newberg on Class Actions</u>, §3.10 at 3-48.

[15] <u>Yaffee v. Powers</u>, 454 F.2d 1362, 1366 (1st Cir. 1972).

7

The First Circuit defines a "strip search" as a visual inspection of an inmate's naked body and a "visual body cavity search" as a strip search that includes the visual inspection of an inmate's anal and genital areas. <u>Blackburn v. Snow</u>, 771 F.2d 556, 561 n. 3 (1st Cir. 1985). Reasonable suspicion is required before a detainee may be subjected to either a strip search or a visual body cavity search.[16] <u>Swain v. Spinney</u>, 117 F.3d 1 (1st Cir. 1997). Blanket strip search policies implemented regardless of reasonable suspicion violate the Fourth Amendment. <u>Roberts v. State of Rhode Island</u>, 239 F.3d 107 (1st Cir. 2001). The defendants' policy falls within <u>Blackburn</u>'s definition, lacks <u>Swain</u>'s reasonable suspicion, and violates <u>Roberts</u>'s ruling. The Jail's policy was illegal.

### 3.    The Claims of the Representative Party Are Typical of Those of the Class

A class representative's claims are "typical" when the representative is "subject to the same statute and policy as the class members."[17] The named plaintiff here shares the same claims as the unnamed plaintiffs. Both the named and the unnamed plaintiffs were, pursuant to the Sheriff's policy, subjected to strip and visual body cavity searches without individualized reasonable suspicion. There was nothing atypical about the circumstances of Mr. Ryan's search.

---

[16] The First Circuit has "repeatedly recognized that strip and/or visual body cavity searches are not routine, and must be carefully evaluated." <u>Swain</u>, 117 F.3d at 7. The Fourth Amendment protects people when they have a "reasonable expectation of privacy." <u>Katz v. United States</u>, 389 U.S. 347, 360 (1967) (Harlan, concurring). An arrested person has a reasonable expectation of not being forced to disrobe, not being observed naked, and not having her or his private parts exposed for observation unless a law enforcement officer has at least a reasonable suspicion that she or he is concealing contraband. <u>Doe v. Calumet City</u>, 754 F.Supp. 1211, 1218 (E.D. Ill. 1990).

[17] <u>Curtis</u>, 159 F.R.D. at 341. <i>See</i> <u>Modell v. Elliot Sav. Bank</u>, 139 F.R.D. 17, 22 (D.Mass. 1991).

### 4.    The Representative Party Will Fairly and Adequately Protect the Interests of the Class

In determining whether the named plaintiff can adequately represent the interest of the absent class members, courts have refused to be restricted by the individual situation of the named plaintiff, but have instead looked at the class-wide allegations of the action.[18] As their interests are identical, the interest of the named plaintiff is by definition not antagonistic with the rest of the class.[19]

### 5.    Attorney for the Named Plaintiff Will Fairly and Adequately Protect the Interests of the Class

When a court certifies a class, the court must appoint class counsel. Fed.R.Civ.P. 23(g)(1)(A). The appointed counsel must fairly and adequately represent the class's interests. Fed.R.Civ.P. 23(g)(1)(B). In making such an appointment, there are a variety of factors the court should consider. The court must consider: counsel's work in identifying or investigating the class's claims; counsel's class-action, complex litigation, and similar claims experience; counsel's knowledge of the applicable law; and counsel's resources committed to class representation. Fed.R.Civ.P. 23(g)(1)(C)(i). The court may consider other matters pertinent to counsel's ability to fairly and adequately represent the class's interests. Fed.R.Civ.P. 23(g)(1)(C)(ii).

---

[18] *See* Liberty Alliance of the Blind v. Califano, 568 F.2d 333, 347 (3rd Cir. 1977). *See also* Sosna v. Iowa, 419 U.S. 393 (1975).

[19] *See* Sosna v. Iowa, 419 U.S. 393, 403 (1974); Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2nd Cir. 1968), *vacated*, 417 U.S. 156 (1974).

9

The named plaintiff's attorney has submitted an affidavit attesting to his qualification. Attorney Friedman has extensive experience in §1983 litigation in state and federal courts and has successfully represented plaintiffs in eight class action suits, including three that, like this case, alleged an unconstitutional policy or custom of strip searching pre-arraignment detainees.[20] Attorney Friedman has identified and investigated the class's claim and is willing to commit the resources necessary to take this case to trial.[21] No other adequate applicant seeks appointment as class counsel.[22]

### C.    THIS CLASS ACTION IS PROPERLY MAINTAINABLE UNDER RULE 23(b)(3) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Rule 23 provides that in order to maintain a class action, the proponent of the class must meet the requirements of Rule 23(a) which have been discussed above, and one of the three parts of subsection 23(b).  Subsection (b)(3) permits class certification when "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

---

[20] Ex. C at ¶¶2 and 3 (Affidavit of Howard Friedman).

[21] Ex. C at ¶14 (Affidavit of Howard Friedman).

[22] Ex. C at ¶15 (Affidavit of Howard Friedman).

10

### 1.     Common Legal and Factual Questions Predominate

There is no precise test to determine when common issues predominate. Courts often look for "an essential common link among class members" that can be remedied through litigation.[23] The essential common link here is the shared facts and legal issues that establish the class members' claims. As to issues of fact, each class member's claim repeats the same story: "I was arrested; I was brought to the Hampshire Jail; a corrections officer made me take off all my clothes and viewed my naked body." As to issues of law, each class member's argument goes the same way: "I was strip searched without individualized reasonable suspicion pursuant to the Sheriff's policy or custom. This was unconstitutional." These common issues predominate because they are the essential facts and law that establish the claim.

The defendant will likely note that damages could vary from individual to individual. Possible variance in individual damages is not a basis to deny class certification.[24] The class members' damages claims here are similar. All class members suffered from visual searches, not physical ones, so their injuries are all emotional. The searches all took place in a private cell before an officer of the same sex, so the class

---

[23] *Newberg on Class Actions* §4.25 at 4–86 (3d ed. 1992). *See* Sterling v. Velsicol Chemical Corp., 855 F.2d 1188, 1196–97 (6th Cir. 1988) (certifying a class under Rule 23(b)(3) is the best method to resolve the controversy because common issues existed such that defendant's liability could be determined on class-wide basis).

[24] Tardiff v. Knox County, 365 F.3d 1, 7 (1st Cir. 2004) ("the need for individualized damage decisions does not ordinarily defeat predominance where there are still disputed common issues as to liability. . ."). See also Mack, 191 F.R.D. 16, 25 (D.Mass. 2000) (despite the possibility of individualized damages, class certification was appropriate because the plaintiffs, subjected to the same strip search policy, shared sufficient common legal claims).

members do not claim that the manner or location of the search was improper.[25] Their

amounts of damages will vary, therefore, within a limited range.[26]

In <u>Mack</u>, the plaintiffs were (as here) all arrestees subjected to strip searches

without individualized reasonable suspicion. The court held that "given the uniform and

indiscriminate nature of the strip search policy . . . liability can be determined on a class-

wide, rather than individual basis." After the case was certified, summary judgment

established the defendants' liability to all class members; the issue of damages was

resolved by settlement.

Manageability concerns should not be the only consideration regarding

predominance.[27] The court should assess whether the plaintiffs share a core issue

sufficient to overwhelm individual questions.[28] Here, all proposed class members have

been subjected to an unconstitutional strip search. The injuries to all plaintiffs arise out

of a single course of conduct. All plaintiffs share a single legal theory arising under

---

[25]If a class member alleges conduct beyond the policy or custom, it would be beyond the scope of this case.

[26] In the First Circuit, emotional distress claims do not require expert testimony. While emotional distress "damages will not be presumed . . . they are easily proved by [nonexpert] testimony 'showing the nature and circumstances of the wrong and its effect on the plaintiff.'" <u>Maldonado Santiago v. Velazquez Garcia</u>, 821 F.2d 822 (1st Cir. 1987).

[27] "[F]ailure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." *Newberg on Class Actions*, vol. 2 §4.25 (4th ed. 2002). If factors arise later that make it necessary, the court could later limit certification to liability, establish sub-classes, or even decertify.

[28] <u>Maneely</u>, 208 F.R.D. at 78.

similar factual circumstances. Because common factual and legal issues far outweigh the

individual issues in this case, this court should grant certification under Rule 23(b)(3).[29]

### 2.    Class Action Is Superior to Other Methods of Adjudication

The plaintiff class has more than a hundred members. The theoretical alternative

to certification would be more than a hundred individual lawsuits. A class action is

superior to the prospect of so many individual actions.[30] A class action is proper when

it will efficiently resolve the claims of many individuals in a single action, eliminate

repetitious litigation, and avoid possibly inconsistent adjudications.[31] Upon the filing of

such repetitious cases, the court would likely look to joinder lest judicial resources be

wasted. A class action would be more efficient, since the blanket application of the

Hampshire Jail's strip search policy allows liability to be efficiently determined on a

---

[29] An alternate possibility would be for the court to grant partial certification with respect to particular issues under Fed.R.Civ.P. 23(c)(4)(A). *See* Doe v. Calumet City, Illinois, 754 F.Supp. 1211, 1220 (N.D. Ill. 1990). Courts have ordered partial certification of a class for the purpose of determining defendants' liability and appropriate injunctive relief. Maneely v. City of Newburgh, 208 F.R.D. 69, 78 (S.D. N.Y. 2002) (ordering partial class certification to decide whether the defendant maintained an unconstitutional strip search policy). Partial certification is appropriate where a core issue links the plaintiffs but major individual questions exist. Maneely, 208 F.R.D. at 78; Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167–168 (2nd Cir. 2001). In cases where a common issue binds class members but where there might be individual questions about class members, partial class certification is appropriate to serve judicial efficiency. *See* Robinson, 267 F.3d at 167–168 (finding that partial certification to determine whether the city maintained an unconstitutional strip search policy would serve judicial efficiency).

[30] Smith v. Montgomery County, 573 F.Supp. 604, 613 (D.Md. 1983) (class action is far more efficient than individual prosecution of damages actions and is the fairest means to settle the controversy).

[31] Califano v. Yamasaki, 442 U.S. 682, 700–01 (1979).

class-wide, rather than individual, basis. While the theoretical alternative would be difficult, the likely consequences of denied certification would be worse.

### D.     IN THE INTEREST OF JUSTICE, THIS COURT SHOULD CERTIFY THE CLASS

A class action is a tool to vindicate "the rights of groups of people who individually would be without effective strength to bring their opponents into court at all."[32] Without certification, a scant few of the injured parties will win vindication for the violation of their rights. Individual class members are unlikely to challenge the illegal strip searches because most assume that the strip searches, while degrading, are legal, conducted as they are by uniformed county officials as part of a routine practice. Attorneys are unlikely to agree to pursue individual cases because the amount of damages in any one case is not likely to be large. The inability of the class members to pursue individual actions weighs in favor of class certification.[33]

## V.     CONCLUSION

Plaintiffs have met all of the requirements of Federal Rule of Civil Procedure 23 for certification of the classes.  Plaintiffs therefore respectfully request that this Court certify the plaintiff classes as described in their motion for Class Certification.

---

[32] Mack, 191 F.R.D. at 25, quoting Amchem Products v. Windsor, 521 U.S. 591 (1997).

[33] Carrier, 206 F.R.D. at 335. *See, e.g.,* Rodriguez v. Carlson, 166 F.R.D. 465, 480 (E.D. Wash. 1996) (a Rule 23(b)(3) class was superior because it was highly unlikely that indigent non-English speaking plaintiffs would bring suit absent class certification); D'Alauro v. G. C. Services, 168 F.R.D. 451 at 458 (E.D. N.Y. 1996); Patrykus v. Gomilla, 1988 WL 87045 (N.D. Ill. 1988); Smith v. Montgomery County, 573 F.Supp. at 613.

RESPECTFULLY SUBMITTED,
For the plaintiffs,


/s/ Howard Friedman

_____
Howard Friedman
BBO #180080
Myong J. Joun
BBO #645099
Law Offices of Howard Friedman, P.C.
90 Canal Street, Fifth floor
Boston, MA 02114-2022
T (617) 742-4100
F (617) 742-5858
hfriedman@civil-rights-law.com
mjjoun@civil-rights-law.com

15



# Hampshire Sheriff's Office
## Jail and House of Correction

<u>Policies and Procedures</u>

| | |
|---|---|
| Number: <u>3.1.17</u> | Supersedes Number: <u>3.1.17 (4/15/98)</u> |
| Effective Date: <u>March 29, 2000</u> | Page   1   of   5    Pages |
| Subject: Searches | Distribution: <u>All Authorized Manuals</u> |
| Authority: | Issued By: |
| | <u>A.D.S. Security</u> |
| Sheriff | |

References:  ACA #  3A-18 / 3A-33           D.O.C. # 924.06              NCCHC #

## POLICY :

The HJHC provides for searches of the facility and inmates to control contraband and provide for its disposition. This policy is made available to staff and inmates, and is reviewed at least annually and updated if necessary *3A-18.*

The HJHC provides for the preservation, control and disposition of all physical evidence obtained in connection with a violation of law and/or institutional regulation. The HJHC has procedures for: *3A-33/924.06(6)*
> Chain of custody
> Evidence handling
> Location and storage requirements

## PROCEDURE:

A.  Sheriff's Search Authority

1.  The Sheriff or his designee may order the search of any person entering or confined in the Hampshire Jail and House of Correction, in or-on the Hampshire Jail and House of Correction property, including parking areas, in order to ensure the security and safety of the facility, its inmates, employees and visitors. Those searches shall not exceed the standards established under the United States Constitution and the Laws of the Commonwealth.

B.  The HJHC Facility Search Plan

1.  It shall be the plan of the HJHC to do on-going searches of inmates rooms, pat and strip searches and searches of the public areas of the facility. Searches shall be done in these areas to control contraband coming into the facility, to check malicious waste or destruction of HJHC property and to discover hazards to health and safety. Staff and inmates shall be notified in writing(via Policy and Procedure Manual or Inmate Manual) of the general facility policy regarding searches and the items considered to be contraband.

a. All inmate cells and living areas will be searched at least monthly. This is over and above daily inspection of cells.

b. Officers in charge of areas will assign cells to be searched on the 7-3 and 3-11 shift. The breakdown of the number of cells/rooms to be searched is attached.

c. The 11-7 shift will be assigned search areas that encompass the entire building excluding the cells.

d. There are sign off sheets for each area in the control areas of each unit which are to be completed upon the completion of said search.

e. The Shift Supervisor assigned to each shift is responsible for ensuring compliance with this policy.

2. Searches will be conducted in a manner which will avoid unnecessary force, embarrassment, or indignity to an inmate. An inmate's refusal to submit to a pat search, strip search or room search shall result in the inmate being considered a security risk after failing to comply with a direct order. The inmate shall then be isolated in the room where the original order was issued with at least one staff member present. The Shift Supervisor shall be notified of the situation and he/she shall decide whether the situation constitutes a return to higher custody.

3. Searches shall be done at the discretion of the Shift Supervisor or staff member on duty.

4. Contraband includes, but is not limited to the following:

   a. Any form of drugs including prescribed medication and aspirin
   b. Alcohol, including empty cans and bottles
   c. Any weapon, including a kitchen knife outside of the kitchen or dining room
   d. Marijuana or any other controlled substance. Possession of such substances in any amount may be referred to the District Attorney for prosecution as this is a felony
   e. Perishable foods, flammable, caustic and toxic materials
   f. Incense
   g. Any state property not assigned to an inmate's room(kitchen utensils, plates, cups, silverware, clerical implements, recreation equipment)
   h. Any drug related paraphernalia
   i. All types of cameras
   j. Any money(except the limited amount permitted Work Release participants)

5. Searches shall be recorded by means of Visitors Log, Daily Log and written incident reports which are maintained on a regular basis.

C. Strip Searches

1. General - Strip searches should be employed when necessary for the close scrutiny of an inmate's person in determining if that inmate is carrying any item(s) considered to be contraband. Strip searches may be employed for routine security checks or when there is a specific suspicious incident that would indicate that an inmate is perhaps carrying contraband. Specific situations in which strip searches may be employed include, but are not limited to the following: entrance or exit from the facility, before and after court, medical trips after contact visits, after the detection of an alleged disciplinary infraction, when custodial staff have reason to believe a person may possess contraband, after an escape or attempted escape, placement in disciplinary isolation or segregation from general population, routine searches of housing or work areas or transfer to a new facility. All room searches, which extend beyond the cursory search done each morning at inspection, shall be documented in the General Log.

2. Recommended Strip Search Techniques

   a. Strip Searches of individual inmates should be conducted in relative privacy, preferably by two correctional Officers, rendering as much dignity to the situation as possible. Strip searches by members of the opposite sex shall not be permitted.

   b. In conducting a strip search, the following procedures should be followed: the inmate should remove his/her clothing, place each article in one location and then move at least five feet from that location.

2

c. Subsequently a Correctional Officer will conduct visual examination of nude inmate, including hair, ears, nose, under the tongue, armpits, pubic region, rectum, vagina area, inner portion of legs, between toes, soles of feet, any casts or bandages, false teeth or artificial limbs. The inmate should be given verbal instruction so as to ease and expedite the situation.

d. An examination of the inmate's clothing for contraband should follow. This includes turning clothing inside out, checking linings, cuffs, waistbands, seams, patches, collars and shoe heels soles and interiors, eye glass cases, cigarette packages, watches, hats, coats and any other item found on the inmate's person shall be checked for contraband.

D. Full clothed Searches(Pat Searches)

1. General - Fully clothed searches(Pat Searches shall be employed for the relatively quick scrutiny of an inmate's person. Situations where fully clothed searches may be employed may include but are not limited to the entrance or exit to Work Release, recreation and/or programs.

2. Recommended Fully Clothed Search Technique

a. When searching a group of inmates, efforts should be made to keep searched and un-searched inmates separate. Prior to the actual search, an inmate should empty his/her pockets and remove any hat, cap or heavy coat. With arms extended to the side at a right angle to the inmate's torso and feet apart at least 12 inches, the search should commence.

b. Approaching the inmate from the rear, the custodial staff member should start at the top of the head making sure nothing is in the hair. Hair is checked by either running fingers or a comb through the hair. Using both hands, touch or pat a direct course across the bottom of the arms to the armpits and then proceed to the shoulders.

c. Returning hands to original starting position, pat the shoulder and then down the back and sides to the belt line.

d. At the back of the waistline, proceed down the back and sides of the legs to the shoe tops. Check the shoe tips, cuffs and socks and then the front and inside of the legs to the groin area.

e. Observation should be made of the hair, ears, mouth, as well as, any article carried or worn by the inmate.

f. Special care should be exercised in the examination of necklaces, jewelry, hats and coats.

E. Constant Observation / Administrative Segregation

1. An inmate who has been placed in Administrative Segregation, Where the inmate is suspect of having secreted contraband internally either by ingestion, insertion, or other means, shall be informed of the following procedures in reference to the elimination of bodily waste:

a. All elimination of bodily waste shall be done in the presence of a security staff member, who shall personally observe such elimination.

b. All elimination of bodily waste shall be in a container designed for the disposal of bodily waste. The container (s) will either be a toilet fitted with a screen, or Portable Toilet, which has been provided by the facility and placed within the area where the suspected inmate is confined.

c. Under no circumstances shall the suspect inmate touch any area of his body from which he / she has excreted until such time as a security staff member has had the opportunity to do a visual inspection of the body area, area surrounding the container in which the bodily waste has been deposited, and the contents of the container. After visual inspection is complete the

3

inmate may cleanse the body area as necessary. Cleansing Materials shall be placed in the container.

    d. Under no circumstances shall the suspect inmate be allowed to place his/her hand (s) in, or near the container prior to, during, or after the use of the container.

2. Any inmate who violates these rules will be subject to a Disciplinary Report being written and more stringent security measures will be instituted to prevent any further infractions of this procedure.

3. The contents of the container shall be removed after each inmate use, and searched for contraband. The search should be done with a Senior Officer present. If any contraband is found it shall be secured according to existing procedures for contraband.

4. Any time that an inmate is put on Constant Observation Status, an Observation Log will be started and continue until the status has been terminated.

F. Housing Area Searches - (Room Searches)

1. General - In conducting searches of housing areas as with other types of searches two objectives are sought: identification of contraband and the detection of missing or stolen property. As a result, efforts should be made to be thorough in conducting searches of these areas. Care should be taken not to damage an inmate's property or unnecessarily disarrange same. All room searches, except the cursory room search conducted at morning inspection, should be documented in the General Log.

2. Recommended Search Technique - The techniques which should be employed include the following:

    a. Careful visual inspection and physical search should be conducted of all lighting fixtures, washbowls, toilets, plumbing stacks, hollow areas of metal furniture, mattresses, as well as books, clothing, walls, ceilings and floors. Use of electronic sensing devices is encouraged as a supplement to, but not in place of physical searches.

    b. Examination should be made of window frames and overhead ventilators, using a mirror, if necessary, to permit thorough viewing.

    c. Inspection should be undertaken of all security locks and doors using visual observation and tapping with a mallet and/or probing with an instrument.

G. Shop, Program, and Activity Area Searches

1 Food preparation areas, shops, program areas and activity areas with which inmates have contact should be searched periodically. Custodial staff members should be aggressive, thoughtful and inquisitive in conducting searches. All such searches should be documented in the General Log.

H. Vehicle Searches

1. All vehicles entering and exiting the secure perimeter of the HJHC property shall be subject to a thorough search to preclude the introduction of contraband into the facility, and minimize theft of state property.

I. Seizure of Contraband, Chain of Custody, Evidence Handling, Storage Requirements, Disposal of Contraband 3A-33/924.06(6).

1. Contraband Owner Known - When searches result in the seizure of contraband where the owner of the contraband can be clearly identified, that article should be turned over to the Shift Supervisor accompanied by a Disciplinary Report or Incident Report before the end of that tour of duty. All contraband intended to be used as evidence in disciplinary or criminal proceedings should be labeled and stored in a locked cabinet located in the armory.

4

2. Contraband Owner Unknown - When searches result in the seizure of contraband that cannot clearly be established to be the property of a particular inmate, that article should be turned over to the Shift Supervisor accompanied by an incident report before the end of that tour of duty.

3. Chain of Custody, Evidence Handling, Storage Requirements and Disposal of Contraband - All contraband shall be disposed of in a proper manner.

   a. All contraband shall be turned over to the Shift Supervisor on duty. The Shift Supervisor shall forward contraband to the Contraband Control Officer. The Contraband Control Officer shall record the contraband in a log identified for that purpose. Contraband shall be tagged, numbered in sequence and note shall appear in log along with the identifying number regarding where it was found, the amount, who found it, and the action taken.

   b. After the contraband is logged and tagged, it shall be placed in in the armory. If there is not adequate storage space available in the armory another secure area will be designated by the Shift Supervisor.

   c. Only the Contraband Control Officer(s) shall have keys and access to the contraband cabinet and shall be responsible for its contents.

   d. If the Contraband Control Officer is not available at the time of the contraband seizure, the contraband shall be locked in the armory and shall be given to the C.C.O. upon his arrival.

   e. All contraband shall be disposed of as soon as it is deemed that it no longer requires storage. All articles turned over to a prosecuting authority shall be represented by a receipt.

   f. The Contraband Control Officer who disposes of the contraband shall have two(2) witnesses who will sign their names in the Contraband Log, in the appropriate space.

   9. The Contraband Disposal Sheet shall have space provided for recording the amount, where it was disposed of, who disposed of it, witnesses and any additional comments.

   h. Contraband numbers shall coincide in both Log entries(receiving and disposal).

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
CHARLES V. RYAN IV, on behalf of himself  )
and on behalf of others similarly situated, )
     Plaintiffs              )
                                          )     Civil Action No. 05-30017-MAP
        v.                     )
                                          )
ROBERT J. GARVEY, and PATRICK J.          )
CAHILLANE in their individual capacities, )
     Defendants              )
_____)

## AFFIDAVIT OF MYONG J. JOUN

I, Myong J. Joun, on oath, depose and say the following:

1.     I am an attorney in good standing in the Commonwealth of Massachusetts and an associate at the Law Offices of Howard Friedman, P.C.

2.     I estimate that there are approximately 124 individuals who fit the class definition in this case based upon my review and analysis of the electronic booking information provided by the defendants and my review of inmate files at Hampshire Jail and House of Correction ("Jail).

3.     There were a total of 913 booking admissions at the Jail from January 18, 2002 through November 8, 2002. Based on the Jail's booking codes, 442 bookings were determined to be bookings of sentenced inmates. On December 7, 2005, the defendants produced electronic data relating to the remaining 471 bookings of 422 individuals.[1]

---

[1] Some individuals had more than one bookings during the relevant time period.

4.     Consistent with the class definition in this case, bookings of all persons charged with a crime involving drugs or weapons and violent felonies were removed from the database. I removed 202 such bookings of 188 individuals.

5.     Additionally, bookings that contained "remand" as an offense were removed because these individuals were sent to the jail from a court, thus they were not pre-arraignment detainees.  I removed 3 bookings of 2 individuals.

6.     This left 266 bookings of 241 individuals. Because the Jail did not record in its booking computer system why or how a prisoner was brought to the Jail, I could not determine whether the individuals were pre-arraignment or pretrial detainees from examining the booking data alone.

7.     On February 6, 2006, I visited the Jail and reviewed the inmate files relating to 84 separate bookings of 77 individuals. Based on my examination of writs, mittimus, returns of warrants and other documents contained in the files, I determined that 52 bookings were of 48 pretrial detainees and 32 bookings were of 32 pre-arraignment detainees.[2] Thirty-eight percent (38%) of the files that I reviewed were bookings of pre-arraignment detainees.

---

[2] Three individuals had multiple bookings where at least one booking was as a pretrial detainee and at least one booking as a pre-arraignment detainee.

8.    Of the 182 inmate files that I have not examined,

    a.    The defendants identified 19 bookings of 17 individuals as meeting the class definition.[3]

    b.    Two additional individuals not identified by the defendants were held on a "request to hold" by local police departments. A "request to hold" means that the person was held pre-arraignment on behalf of a police agency.

    c.    Six individuals were held on civil contempt.

    d.    Ten individuals were held on a warrant for temporary custody issued by the State Parole Board.

    e.    One person was held as witness in protective cudtody.[4]

    f.    Of the remaining 144 bookings, I estimate that 54 are bookings of pre-arraignment detainees based on the same percentage I found in the sampling as detailed in paragraph 7 above (38%).

9.    Based on the above, I estimate that there are approximately 124 individuals who fit the class definition in this case.

I declare under penalty of perjury that the foregoing is true and correct.

        Executed on this 3rd day of March, 2006,

        /s/ Myong J. Joun
        MYONG J. JOUN

---

[3] Defendants identified a total of 26 individuals who fit the class definition. I reviewed inmate files for bookings related to 9 of the 26 individuals during my February 6th visit to the Jail.

[4] In a telephone conference with defendant Patrick Cahillane and his counsel on January 18, 2006, defendant Cahillane confirmed that a person held as a witness would have been strip searched and agreed that the person should be treated as a pre-arraignment detainee.

3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                          )
CHARLES V. RYAN IV, on behalf of himself )
and on behalf of others similarly situated,       )
                    Plaintiffs                              )
                                                          )     Civil Action No. 05-30017-MAP
                    v.                                     )
                                                          )
ROBERT J. GARVEY, and PATRICK J.            )
CAHILLANE in their individual capacities,       )
                    Defendants                            )
_____)

## AFFIDAVIT OF HOWARD FRIEDMAN

I, Howard Friedman, on oath, depose and say the following:

1.      I am counsel for the plaintiffs in this case.

2.      I was admitted to the bar of the Supreme Judicial Court of Massachusetts in December 1977 and to the United States District Court for the District of Massachusetts in January 1978. My practice has always included representing plaintiffs in civil rights cases under 42 U.S.C. §1983. Since 1981, my law practice has focused on plaintiffs' civil rights cases, particularly police misconduct claims.

3.      I have represented the plaintiffs in eight class action suits. Three of those cases, Mack v. Suffolk County, 191 F.R.D. 16 (D. Mass. 2000),  Connor v. Plymouth County, No. 00-10835-RBC, and Nilsen v. York County, 219 F.R.D. 19 (D.Me. 2003), alleged unconstitutional policies or customs of strip searching pre-arraignment detainees.

4.    Before this case, I represented plaintiffs in thirteen §1983 cases challenging the constitutionality of strip searches. In addition to the three class actions, one case was brought on behalf of four plaintiffs who were strip searched at the same police station. I first represented a plaintiff in a case challenging the constitutionality of a strip search in 1984. One of the individual strip search cases went to trial, resulting in a verdict under §1983 for the plaintiff against a police officer and against the town that employed him. The other cases either are pending or settled in the plaintiff's favor.

5.    I represented plaintiffs in a class action for declaratory and injunctive relief against a policy directing unlawful seizures in <u>Ocasio v. City of Lawrence</u>, 788 F.Supp. 99 (D.Mass. 1992).

6.    I am a member of the civil rights section of the Association of Trial Lawyers of America. I was chair of the section from 1996 to 1997. I am also a member of the Federal Bar Association, the Massachusetts Bar Association, and the Massachusetts Academy of Trial Lawyers. I am the President of the National Police Accountability Project.

7.    In October 1999, I served on a panel discussing strip search law at "Justice '99 Boston—the International Criminal Justice Expo & Conference" sponsored by Northeastern University College of Criminal Justice.

8.    I spoke on the subject of class actions at Professor Karen Blum's first year civil procedure class at Suffolk University School of Law for three years.

2

9.    I have consulted with attorneys from California, New York, Kentucky, Louisiana, Illinois, Massachusetts, Maine, Montana, Washington, and Wisconsin on the subject of strip searches.

10.    I am aware of federal and state certified class actions alleging unconstitutional strip searches in fourteen states.

13.    Exhibit A is a fair and accurate copy of the Jail's policy on the subject of strip searches that was obtained from the defendants in discovery in this case.

14.    I have identified and investigated the class's claim in this case and I am willing to commit the resources necessary to take this case to trial.

15.    There are no other adequate applicant seeking appointment as class counsel in this case.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on this 3rd day of March, 2006,


/s/ Howard Friedman
HOWARD FRIEDMAN